**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JEFFERY K. ARMSTRONG,

          **Plaintiff,**

      **v.**

NORMAN Y. MINETA,

          **Defendant.**

**Civil Action 04-01661 (HHK)**

---

**MEMORANDUM OPINION AND ORDER**

Jeffrey K. Armstrong brings this action against Norman Y. Mineta, Secretary of the

Department of Transportation,[1] alleging that the Department of Transportation ("DOT")

wrongfully terminated him from his position as a Physical Security Specialist in violation of the

Civil Service Reform Act, 5 U.S.C. § 7513 ("CSRA"), and Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e-16(a) ("Title VII").  Armstrong asserts that he was

terminated because of his race (Black) and because he had engaged in protected equal

employment opportunity ("EEO") activity.  Before the court is DOT's motion for summary

judgment.  Upon consideration of the motion, the opposition thereto, and the summary-judgment

record, the court concludes that the motion must be granted in part and denied in part.

**I.  BACKGROUND**

Armstrong was hired by DOT's Office of Security as a Physical Security Specialist in

October 2002.  Before joining DOT, Armstrong spent almost four years as a Physical Security

---

[1] This action is brought against Secretary Mineta in his official capacity only.

Specialist at the Federal Emergency Management Agency ("FEMA") and ten years with the Drug

Enforcement Agency ("DEA") during which time he was assigned to various security-related

functions.

DOT requires that all Physical Security Specialists "become a Special Deputy U.S.

Marshall in order to perform his/her primary protection duties."  Def.'s Ex. 1 (Physical Security

Specialist (GS-080-13) Position Description).  The United States Marshals Service ("USMS")

Special Deputation Program, in turn, requires all Special Deputies to have certain qualifications,

including the "successful completion of a basic law enforcement training program" and "previous

law enforcement experience."[2]  Def.'s Ex. 2 (USMS Policy Directive No. 99-13).  While the

Special Deputation Program is administered by USMS, primary responsibility for ensuring that

applicants meet the requirements for deputation lies with the requesting agency.

Armstrong first became a Special Deputy when he was employed by FEMA.  At FEMA

Armstrong was a Physical Security Specialist with responsibilities that included providing

executive protection for a FEMA federal coordinating officer and physical security for various

facilities utilized by FEMA employees.  FEMA required that Physical Security Specialists with

these type of protection duties apply for Special Deputy status, a requirement with which

Armstrong complied.  Armstrong's first request for Special Deputy status was filed on April 8,

1999, and that request was granted shortly thereafter.

---

[2] Individuals that are granted Special Deputation have the authority to perform one or more of the following federal law enforcement functions: "(1) Seek and execute arrest warrants and search warrants; (2) Make arrests without a warrant, if there are reasonable grounds to believe that the person to be arrested has committed or is committing a violation of federal law; (3) Serve subpoenas and other legal writs; (4) Monitor Title III intercepts (electronic surveillance); and/or (5) Carry firearms for personal protection or the protection of persons covered under the federal assault statutes."  Def.'s Ex. 2 (USMS Policy Directive No. 99-13).

Upon Armstrong's October 2002 transfer to DOT, Armstrong was required to reapply for Special Deputy status because the agency sponsoring his application had changed.  In connection with this application, DOT certified that Armstrong satisfied all the requirements necessary for Special Deputy status, and the application was granted.  On July 2, 2003, Armstrong once again sought to renew his Special Deputy status, and again, the DOT certified that Armstrong was eligible for Special Deputy status.  As with the previous application, this application was granted.

Armstrong worked for several months at DOT without incident.  In June 2003, however, Armstrong maintains that the then-Acting Director for the Office of Security, Michael Prendergast, began to question the proprietary of Armstrong's use of administrative leave.  According to Armstrong, Prendergast expressed concern that he had taken an uncommon number of days off within a five month period.  Armstrong believed that his leave was justified and proper, and therefore raised the issue with Lee Privett, Prendergast's supervisor and the Director of Security.  According to Armstrong, Privett accepted his explanations and, despite Prendergast's inquiries, ultimately no disciplinary action was taken against him for the alleged abuse of administrative leave.

On August 20, 2003, Armstrong submitted an affidavit during the investigation of an EEO complaint filed by a colleague, Anisa Williams.  Williams claimed that she was discriminated against because of her race, and Armstrong supported her claim by submitting an affidavit that recounted the administration's review of his leave record, an effort that Armstrong believed was motivated by racial animus.

Shortly after Armstrong submitted his affidavit, he again experienced difficulty related to his use of leave.  In particular, Armstrong alleges that following his participation in the EEO investigation of Williams's complaint, Privett and Prendergast denied his request for leave to undergo a federally-mandated medical examination related to his work in New York City with FEMA immediately after the September 11, 2001 terrorist attacks.  Though there are conflicting accounts of the basis for the reversal of the denial, both parties concede that Armstrong was eventually permitted to take his leave and received his medical examination.[3]

In or around October 2003, Armstrong confronted Privett with Armstrong's belief that the inquiries concerning his use of leave were the result of discrimination.  During this meeting, Armstrong told Privett that he believed Prendergast was a racist.  According to Armstrong, Privett responded to this accusation by telling Armstrong that he (Privett) was "in a position to harm Mr. Armstrong's career" and "not to 'f**k' with him."  Compl. ¶ 14 (alterations in original).

Approximately a month after this meeting, while preparing for a mediation session designed to address Armstrong's prior discrimination-related grievances, Privett noticed "discrepancies" within Armstrong's employment application.  Privett states that he had hoped to be able to offer Armstrong a position with a different agency, the Transportation Security Administration ("TSA"), and was therefore preparing Armstrong's resume to be submitted in connection with a job application.  One of the discrepancies that Privett discovered was an

---

[3] According to Armstrong, his request for leave was not granted until DOT's Assistant Secretary for Transportation intervened on his behalf.  Compl. ¶ 13.  DOT contends, however, that permission was granted once Armstrong provided the appropriate medical documentation. Answer ¶ 13.

apparent contradiction between Armstrong's resume, which indicated that he had attended a Federal Law Enforcement Training Center ("FLETC") course in 2002, and his application for Special Deputy status, which indicated that he had completed the FLETC course in 2000.  Upon further inquiry, Privett learned that in 2002 Armstrong had attended a two-week introductory course at FLETC that was not designed for criminal investigators.  Apparently, Privett had assumed that Armstrong had participated in a more advanced "sixteen week criminal investigator's school."  *Id.*  The nature of the FLETC course was significant given that Armstrong had represented that this FLETC course served as his "basic law enforcement training," a necessary predicate for receiving USMS Special Deputy status.

The other discrepancy that Privett observed was a statement that Armstrong had acquired "law enforcement experience" at FEMA.  This concerned Privett because he did not believe that FEMA was a law enforcement agency.  In order to assuage his fears, Privett contacted FEMA to determine what, if any, law enforcement duties Armstrong performed at the agency.  According to Privett, he was told that Armstrong "had no law enforcement responsibilities with that agency."  *Id.*  Again, this apparent lack of experience was significant as an additional requirement for Special Deputy status is a year of "prior law enforcement experience."

Ultimately, Privett concluded that Armstrong was not qualified to receive Special Deputation.  Accordingly, Privett contacted USMS to apprise the agency of DOT's decision to withdraw its support for Armstrong's continued status as a Special Deputy.  After a number of communications between the two agencies, and because primary responsibility for verifying a Special Deputy's qualifications rests with the certifying agency, USMS accepted DOT's

assessment of Armstrong's inability to remain a Special Deputy.  On January 20, 2004, USMS revoked Armstrong's Special Deputy status.

Once Armstrong was stripped of his Special Deputy status, he failed to meet the qualifications required to remain a Physical Security Specialist.  As a result, DOT was faced with two options: reassign Armstrong within DOT or terminate him.  DOT asserts that it attempted to locate a suitable position for Armstrong within DOT but no such position existed, therefore termination was the only viable option.

Prendergast issued Armstrong a Notice of Proposed Removal on February 13, 2004. Privett was originally assigned to make the ultimate decision with respect to Prendergast's recommendation of removal.  Following a request by Armstrong's counsel, however, DOT decided that in order to remove the appearance of impropriety the deciding official would be Linda Washington, the Deputy Assistant Secretary for Administration.  Washington accepted Prendergast's recommendation and issued the Notice of Removal on April 22, 2004.

On May 28, 2004, Armstrong filed a "mixed case" complaint with the Merit Systems Protection Board ("MSPB") in which he alleged that his removal violated both the CSRA and Title VII.  MSPB did not issue a decision within 120 days of the filing of Armstrong's complaint and this action followed.

## II.  ANALYSIS

Armstrong claims that (1) he was terminated in violation of the CSRA, (2)  he was terminated on the basis of his race in violation of Title VII and, (3) he was terminated in

retaliation for his EEO activity, also in violation of Title VII.  DOT seeks summary judgment

with respect to all counts.[4]

## A.  CSRA Claims

As a threshold matter, the court must address whether it has subject matter jurisdiction

over Armstrong's CSRA claim.  The CSRA provides that final decisions of the MSPB are

appealable to the U.S. Court of Appeals for the Federal Circuit, which typically has exclusive

jurisdiction over such challenges.  5 U.S.C.A. § 7703(b)(1).  After review of the agency record,

the Federal Circuit will set aside any action, findings, or conclusions it finds to be "(1) arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without

procedures required by law, rule, or regulation having been followed; or (3) unsupported by

substantial evidence."  5 U.S.C.A. § 7703(c).

---

[4] Under Fed. R. Civ. P. 56, a motion for summary judgment should be granted only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party's "initial responsibility" consists of "informing the [trial] court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

If the moving party meets its burden, the burden then shifts to the non-moving party to establish that a genuine issue as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  To meet its burden, the non-moving party must show that "'the evidence is such that a reasonable jury could return a verdict'" in its favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322 n.3.  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

An exception to the Federal Circuit's exclusive jurisdiction exists, however, when a plaintiff sets forth a claim for a violation of the CSRA in conjunction with a claim of discrimination.  When these so-called "mixed cases" are filed, jurisdiction lies with the federal district court.  After a final decision from the MSPB, a plaintiff is permitted to appeal both components of a mixed case to the district court.  5 U.S.C.A. § 7703(b)(2); *Powell v. Dep't of Defense*, 158 F.3d 597, 598–99 (D.C. Cir. 1998).  The district court then reviews the discrimination claim *de novo*, but employs the same deferential standard used by the Federal Circuit when reviewing the administrative record accompanying the CSRA claim.

A plaintiff pursuing a mixed case, however, need not necessarily await a decision from the MSPB before bringing her mixed case to the district court.  If the MSPB does not issue a final decision within 120 days of the filing of an appeal, the plaintiff may file a civil action in the district court "to the same extent and in the same manner" as allowed under Title VII and other anti-discrimination statues.  5 U.S.C.A. § 7702(e)(1)(B).  It is this provision upon which Armstrong relies in bringing the instant action.

While DOT does not contest this court's jurisdiction over Armstrong's discrimination claim, DOT argues that in the absence of an underlying decision from MSPB there is no subject matter jurisdiction over Armstrong's CSRA claim.  Because the district court's review of Armstrong's CSRA claim will be a deferential review of the administrative record, DOT insists that a record must be created in order to establish jurisdiction.

DOT's position has merit.  This court recently addressed the question of its jurisdiction in mixed cases in *Ikossi v. England*, 406 F. Supp. 2d 23 (D.D.C. 2005).  In *Ikossi,* the plaintiff sought to assert claims of sex, race, age, and national origin discrimination, as well as a violation

of the CSRA. This court concluded that no jurisdiction exists over a CSRA claim until a ruling

by the MSPB.  In pertinent part, the court stated:

> [P]laintiffs who wish to bring their entire mixed case to federal district court must await a final decision of the MSPB and appeal the decision under § 7703(b) based on the administrative record.  When the MSPB issues a final ruling on plaintiff's CSRA claims and the administrative record is filed, this court could review the decision for arbitrariness, abuse of discretion, and substantial evidence.  Until then, this court has no jurisdiction over plaintiff's CSRA claims . . . .

*Id.* at 30 (citations omitted); *see also Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 472 (6th Cir.

2003) (stating that "on-the-record review is required for nondiscrimination claims . . . if the

'mixed case' complaint is appealed from the MSPB.").[5]

The statutory scheme enacted by the CSRA vests MSPB with expertise in determining

whether a personnel action promotes "the efficiency of service."  A review of Armstrong's claim

without a well-developed administrative record would deprive the court of that expertise.

Accordingly, DOT is granted summary judgment with respect to Armstrong's CSRA claim.

## B.  Discrimination Claims

The court next turns to Armstrong's Title VII claims, over which there is no dispute as to

the court's jurisdiction.  Title VII of the Civil Rights Act of 1964 makes it illegal to discriminate

against federal employees because of their race.  *See* 42 U.S.C. § 2000e-16.  The Act also

prohibits employers from discriminating against employees because they have assisted or

participated in an administrative investigation of discrimination charges.  *See* 42 U.S.C. § 2000e-

---

[5] In *Seay*, the Sixth Circuit noted a distinction between mixed cases that arrive in federal district court by way of an appeal from MSPB and those that are filed following a plaintiff's use of an agency's EEO process.  339 F.3d at 472.  Focusing on the EEO-process alternative, the Sixth Circuit concluded that *de novo* review of the CSRA portion of a mixed case was permissible.  Here, however, Armstrong did not use the EEO process but instead appealed from the MSPB.  Compl. ¶ 22.

3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); *see also Barns v. Small*, 840 F.2d 972, 976 (D.C. Cir. 1998) (reading § 2000e-16 to prohibit retaliation, as defined in § 2000e-3).

Individual Title VII claims of disparate treatment are analyzed under the familiar three-part standard first announced in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and subsequently refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Under the *McDonnell Douglas* test, the plaintiff has the burden of making a prima facie showing of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of disparate-treatment discrimination, a plaintiff must demonstrate that "'(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). To set forth a prima facie case of retaliation, the plaintiff must show (1) that she engaged in a statutorily protected activity; (2) that the employer took an adverse action; and (3) that a causal connection existed between the two. *See Broderick v. Donaldson*, 437 F.3d 1226, 1231–32 (D.C. Cir. 2006). A plaintiff can show a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Rochon v. Gonzales*, 438 F.2d 1211, 1220 (D.C. Cir. 2006). The existence of a prima facie case creates a presumption that the employer acted in a discriminatory manner.

Once a plaintiff has established a prima facie case, the burden shifts to the employer to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the employment action. *See McDonnell Douglas*, 411 U.S. at 802. The defendant's burden is one of production only. *See Hicks*, 509 U.S. at 509. The ultimate burden of persuasion remains at all times with the plaintiff. *See Burdine*, 450 U.S. at 253. Once the defendant meets her burden, the plaintiff's initial presumption of discrimination "drops from the case" and the plaintiff has the opportunity to demonstrate that the defendant's explanation is not the true reason for the employment action. *See Hicks*, 509 U.S. at 507–08. In determining whether the defendant's action was motivated by discriminatory animus, the court can consider (1) evidence of a prima facie case; (2) evidence attacking the employer's proffered explanation; and (3) any further evidence of discrimination. *See Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*). Evidence establishing a prima facie case and disproving the employer's stated reason for its actions, without additional evidence, permits, but does not compel, a finding of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000).

**1. Prima Facie Case of Race Discrimination**

Here, Armstrong has stated a prima facie case of disparate-treatment discrimination. With respect to the first two prongs of the analysis, there is little question that Armstrong has carried his burden. The record is clear that (1) Armstrong is Black and (2) DOT discharged him from his position as a Physical Security Specialist.

Turning to the third prong, a plaintiff may satisfy this requirement by showing that the discharge was not the result of "the two [most] common legitimate reasons for discharge:

performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). Here no evidence has been presented that DOT was unsatisfied with Armstrong's performance. While Privett and Prendergast questioned Armstrong regarding his use of administrative leave, DOT admits that "[o]nce Plaintiff explained to his supervisors about his family situation and the need for his excessive sick leave, the DOT never questioned his sick leave again."[6] LCvR 56.1 Stmt. ¶ 31. Therefore, the record is uncontroverted that this potential issue affecting Armstrong's performance was a non-factor in DOT's decision to discharge Armstrong.

DOT states, however, that, following the discovery of what it believed to be shortcomings in Armstrong's qualifications, Armstrong's supervisor determined that he would be unable to perform the essential functions of his position *in the future*. This belief, however, was speculative and based solely on the manner in which DOT construed the USMS's requirements for the attainment of Special Deputation. Because the court has reservations about DOT's interpretation of the type of experience and training demanded by USMS, discussed *infra*, the court is unwilling to accept that, as a matter of law, Armstrong was unable to acquire Special Deputy status and thereby unable to perform the essential functions of a Physical Security Specialist. Moreover, Armstrong has provided sufficient evidence of prior experience and

---

[6] Armstrong's complaint makes clear that he seeks recovery for his termination under various theories. It is somewhat more ambiguous, however, if Armstrong also seeks recovery for Privett's and Prendergast's allegedly unnecessary scrutiny of his leave record. To the extent that Armstrong does allege that the review of his record was in violation of Title VII, the court finds that the inquiries made by Privett and Prendergast—which, as discussed above, did not result in any disciplinary action—do not constitute "adverse employment action." *See, e.g., Brody v. Brown*, 199 F.3d 446, 457 (D.C. Cir. 1999). Accordingly, assuming that Armstrong has asserted any claims that arise solely from the perscrutation of his use of leave, summary judgment is granted in DOT's favor.

training—including 160 hours of training while at FEMA—to survive a challenge to the showing required to establish the third element of a prima facie case of discrimination.

Even if the court were to find this showing insufficient, Armstrong could also satisfy the third prong of the prima facie analysis by demonstrating that he was treated differently from similarly situated employees who are not part of a protected class. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). In this regard, Armstrong directs the court's attention to the training and experience of two peers, Chris Maney and Raymond Scott Rieger. Armstrong argues that these DOT Physical Security Specialists, both white, had no experience as "sworn law enforcement officers" and lacked "basic law enforcement training" provided by FLETC, yet were nonetheless certified by DOT as eligible for Special Deputation. DOT responds by stating that both Maney and Scott had served as military police in the armed services and therefore are not "similarly situated" to Armstrong. As for their training, DOT states that both men had training as "Security Specialists," and again, this belies any argument that they are "similarly situated" to Armstrong. Def.'s Reply at 12.

"[Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *George*, 407 F.3d at 415–16 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). In this case, a reasonable jury could find that Armstrong, Maney, and Scott were similarly situated. While Maney's and Scott's military service does appear to be a distinction, the difference in the three men's training is not apparent on its face.

### 2. Prima Facie Case of Retaliation

Title VII shields federal employees from reprisal actions by their employers by making it unlawful to discriminate against an employee because the employee "has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *Rochon*, 438 F.3d at 1215–16 (concluding that section 2000e-3(a) applies to federal employment actions through the language of 42 U.S.C. § 2000e-16). In order to establish a prima facie case under Title VII Armstrong must demonstrate (1) that he engaged in a statutorily protected activity; (2) that DOT took an adverse action in response to this protected activity,[7] and (3) that a causal connection exists between the two. *See Broderick*, 437 F.3d at 1231–32.

Both parties concede that Armstrong filed an affidavit in support of a co-worker's claim of discrimination and thus engaged in protected activity. Similarly, neither party contests that Armstrong's termination is an adverse action that would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination," *Rochon*, 438 F.3d at 1219 (quotations omitted). As a result, the first and second prongs of the analysis are satisfied.

---

[7] Taking heed of the D.C. Circuit's instruction in *Rochon v. Gonzales*, the court is aware that a plaintiff need not demonstrate that the adverse action taken by the employer is a "personnel action" or "employment-related." 438 F.3d at 1217–18. Rather, any challenged action that "would have been material to a reasonable employee," or "dissuaded a reasonable worker from making or supporting a charge of discrimination" is actionable under Title VII. *Id.* at 1219 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).

Though this distinction could presumably have an affect on the court's earlier holding that any claim related to Privett's and Prendergast's review of Armstrong's record could not survive DOT's motion for summary judgment because it did not constitute an "adverse employment action," *see supra* n.5, the court need not address the distinction in this context since the scrutiny of Armstrong's record began well before he engaged in any protected activity.

Armstrong alleges that Privett first questioned his use of leave in or before June 2003, Pl.'s Ex. 10 at 3–4 (EEO Counselor's Report), and Armstrong did not file his affidavit in support of Williams's discrimination claim until August 20, 2003. As a result, Armstrong cannot demonstrate there was a causal connection between the inquiry into his use of leave and his decision to engage in protected activity.

The third prong of the inquiry "may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse . . . action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (1985).  Armstrong filed his affidavit in support of Williams's complaint on August 20, 2003 and Privett initiated the inquiry into Armstrong's qualifications in or around November 2003, approximately three months later. Given the close proximity between the date that Armstrong engaged in protected activity, the filing of the affidavit, and the initiation of his termination proceedings, DOT does not contest that this component of Armstrong's required showing is met.  Accordingly, the court finds that Armstrong has set forth a prima facie case of retaliation.

### 3.  Legitimate, Nondiscriminatory Reason for Termination

Because Armstrong has established the elements of prima facie case of retaliation and discrimination, the court next examines whether DOT has provided a legitimate nondiscriminatory reason for its action.  *See Broderick*, 437 F.3d at 1232 (holding that once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to proffer "a legitimate, nondiscriminatory reason for its actions"); *McDonnell Douglas,* 411 U.S. at 792–93 (establishing the burden-shifting framework utilized in discrimination claims).

The legitimate reason offered by DOT to justify Armstrong's removal is that Armstrong was unqualified to serve as a Physical Security Specialist because he did not have, and given his lack of appropriate training and experience, could not acquire, Special Deputy status.  DOT points out that it is undisputed that DOT Physical Security Specialists are "required to become a Special Deputy U.S. Marshall in order to perform his/her primary protection duties," Def.'s Ex. 1 (Physical Security Specialist (GS-080-13) Position Description), and that it is likewise

undisputed that USMS demands that Special Deputies demonstrate "successful completion of a basic law enforcement training program" and "previous law enforcement experience."  Def.'s Ex. 2 (USMS Policy Directive No. 99-13).  DOT argues that neither Armstrong's tenure at DEA nor his service at FEMA satisfies USMS's "law enforcement experience" requirement for acquiring Special Deputy status.  DOT maintains that Armstrong's duties at DEA were "in support of" law enforcement, but not actual law enforcement.  In support of this proposition, DOT cites Armstrong's response to DOT's written inquiry, which states "I worked with 1811's in support of law enforcement duties while I was with the technical operations group at the DEA."  Def.'s Ex. 20 (Questionnaire dated Dec. 5, 2003).  DOT also relies on Armstrong's lack of authorization to carry a firearm while employed by DEA.

With respect to Armstrong's employment at FEMA, DOT again argues that, notwithstanding Armstrong's permission to carry a firearm and his executive protection responsibilities, this position does not qualify as "law enforcement experience."  DOT points out that FEMA is not a law enforcement agency and argues that law enforcement experience is limited to "working as a police officer, military police or criminal investigator."  Def.'s Mot. at 19.

DOT also argues that Armstrong's law enforcement training suffered from serious deficiencies.  When Armstrong applied for Special Deputy status after transferring to DOT, he indicated that he had met USMS's "law enforcement training" requirement through attendance at "FLETC Criminal Investigation School" in September 2000.[8]  Def.'s Ex. 23 (Application for

---

[8] Armstrong's application for employment with DOT describes the training program in slightly different terms.  It states that he attended the "Federal Law Enforcement Training Center (FLETC) Criminal Investigations" program in August 2002.  Def.'s Ex. 14 (Armstrong

Special Deputy status, dated Oct. 24, 2002).  According to DOT, the agency initially believed that this course description referred to an extensive program that takes fifty-five days to complete.  Privett maintains that once he discovered that the class in which Armstrong had enrolled was a ten-day course titled "Introduction to Criminal Investigations," and designed for non-law enforcement employees,[9] he no longer believed that Armstrong was in compliance with the USMS's training requirements.

In assessing DOT's proffered reason for Armstrong's termination, the court is mindful that DOT bears only a burden of production to articulate a legitimate, nondiscriminatory reason for its actions.  *Hicks*, 509 U.S. at 506–07, *Burdine*, 450 U.S. at 254.  At this stage of the analysis, DOT "need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254.  Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions, which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause for the employment action." *Hicks*, 509 U.S. at 507 (quotations omitted).  In this instance, DOT has introduced admissible evidence that, if believed, demonstrates that Armstrong was not qualified to continue serving as a Physical Security Specialist.  Therefore, it has met its burden.

---

application)

[9] The Introduction to Criminal Investigations Program course description states that: "[I]t is designed for regulatory and compliance inspectors, paralegals, auditors, technical personnel, and others who might assist in a criminal investigation, be required to testify in a criminal matter, or refer a matter to court for criminal investigators."  Def.'s Ex. 21 (FLETC "Introduction to Criminal Investigations Program").

### 4. Pretext

Having found that DOT has offered legitimate, nondiscriminatory reasons for its termination of Armstrong, the court next considers whether Armstrong has offered evidence from which a reasonable jury could conclude that DOT's benign explanations are merely pretextual. *Mastro v. Potomac Elec. Power Co.*, 2006 WL 1359604, at *8 (D.C. Cir. May 19, 2006) (citing *Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006). Armstrong may accomplish this task "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. When assessing the strength of Armstrong's showing, the court is free to examine all the evidence presented, including "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004) (quoting *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 763 (D.C. Cir. 2002)).

### a. "Experience" and "Training" Requirements

According to Armstrong, the evidence of pretext comes in many forms. Foremost among the arguments raised by Armstrong is that Privett and Prendergast manipulated the USMS's experience and training requirements in an effort to find Armstrong ineligible for Special Deputation. An essential element of this argument—about which there is no dispute, Def.'s Reply at 15—is that nowhere in USMS's regulations, nor in DOT's regulations, are the terms "law enforcement experience" or "basic law enforcement training" defined or interpreted.

According to Armstrong, the subjective nature of these requirements permitted DOT to unreasonably conclude that Armstrong's work at FEMA, as well as his training at FLETC, was inadequate.

DOT responds by stating that, though no written definition of the terms exist, they have been consistently interpreted by Prendergast, Privett, and Deem, and that Armstrong simply did not meet these standards.  Additionally, DOT insists that it relied upon USMS's interpretation of each requirement and was not afforded unchecked discretion to interpret the regulations.

Addressing the latter of these responses first, the court observes that there is indeed evidence in the record that Deem, an employee of USMS, ratified Privett's conclusions concerning Armstrong's lack of qualification.  Specifically, DOT has submitted a letter in which Deem writes "we concur with DOT's determination that Mr. Armstrong does not meet the training requirement or the requirement of previous law enforcement experience."  Def.'s Ex. 4 (Letter from Deem to Privett dated Jan. 20, 2004).  Similarly, there is also evidence that Privett's conclusions regarding Armstrong's qualifications were reviewed by Linda Washington—the ultimate decisionmaker with respect to Armstrong's removal—who likewise determined that Armstrong lacked the requisite experience and training.  Def.'s Ex. 13 at 70 (Washington Dep.).

These citations are not, however, dispositive.  There is conflicting evidence that supports the conclusion that the each of the later affirmations of Armstrong's deficient qualifications were based solely on perfunctory examinations that relied on Privett's initial assessments.  Armstrong directs the court's attention to Deem's deposition testimony in which Deems states that, traditionally, USMS relies on the agency's conclusions concerning an applicant's fitness for Special Deputation.  Perhaps more significantly, Deem also discusses the January 20, 2004, letter

cited above and reveals that his conclusions in that letter were based upon the information

provided by DOT and nothing more.[10]   In turn, Washington's support for Privett's proposed

removal relied heavily on USMS's statement that Armstrong did not meet their criteria.   *See*

Def.'s Ex. 13 at 70 (Washington Dep.).   As such, it is possible for a trier of fact to conclude that

only Privett interpreted the requirements.

　　　　As to whether or not DOT's application of USMS's Special Deputy standards is the only

possible interpretation of the experience and training requirements, again, there is evidence in the

record that contradicts DOT's assertions.  With respect to the training requirement, DOT offers no

guidance as to what criteria are necessary for a training course to pass muster as "basic law

enforcement training."   Instead, DOT states only that Armstrong's training was insufficient.

DOT's decision rests exclusively on one aspect of the FLETC course in which Armstrong

enrolled—that it was designed for non-criminal investigators (as opposed to the extensive

FLETC course that it first believed Armstrong attended).   No additional authority is cited.

　　　　After careful review of the record, the court has identified, at least arguably, an alternative

definition of "basic law enforcement training."   During the course of his deposition, Deem

articulates a number of broad guidelines used by USMS in analyzing whether an applicant's

training comports with its requirements for Special Deputation.   Deem testified that "basic law

---

[10] Deem states in his deposition:
 Q. [I]n your letter . . . what you're saying is that, look, this is what you tell me, and if you tell me he's not meeting these requirements, he doesn't meet them?
 A. Correct.
 Q. You're not making an individual determination that he met them or didn't meet them; is that right?
 A. I'm basing it on what DOT has told me.
Pl.'s Ex. 8 at 49–50 (Deem Dep.)

enforcement training" should include "firearms training," "law," and "use-of-force training."

Pl.'s Ex. 8 at 22–23 (Deem Dep.).  In addition, when discussing the length of this program Deem

testified that "I don't think there's any—I mean, every law enforcement academy and federal

agency has different lengths to their academy.  I mean, I don't think there's a standard length, but

as long as it's a successful completion of a basic—where everything we're looking for is

included."  *Id.*

    Applying governing principles, the court finds that whether or not Armstrong attended a

course in "basic law enforcement" is a disputed issue of material fact.  While at FEMA

Armstrong received 160 hours of training, 80 of which were comprised by the Criminal

Investigations Training Program administered by FLETC.  Pl.'s Ex. 5 (Mem. re: Interview with

Bob King, Chief, Physical Security, FEMA; dated Dec. 8, 2003).  An additional eighty hours of

instruction overseen by FEMA included forty hours of firearms training, as well as courses

addressing "use of force continuum;" "vehicle stops;" "apprehension, detention and arrest;" "use

of non-deadly force;" and "Miranda."  *See* Pl.'s Ex. 24 (FEMA Deputy Training Program

Curriculum).

    The court likewise finds that Armstrong has raised a triable issue of fact regarding DOT's

contention that Armstrong's lack of "prior law experience" resulted in his termination.  Citing

the deposition testimony of Privett, Prendergast, and Deem, DOT insists that the only acceptable

forms of "prior law enforcement experience," are service as a "local cop," as a "federal agent," or

as a member of the "military police."  Def.'s Ex. 8 at 157–59 (Privett Dep.); *see also* Def.'s

Reply Ex. D at 107–11 (Prendergast Dep.); Def.'s Ex. 3 at 25 (Deem Dep.).  This narrow

definition, however, does not comport with other portions of the record, in particular, Deem's

deposition testimony.  Deem states that an individual does not necessarily have to be working for

a "law enforcement agency" in order to acquire "law enforcement" experience; rather, what is

significant is that they are "doing law enforcement work."  Pl.'s Ex. 8 at 23–24 (Deem Dep.).

Additionally, Deem suggests that the parameters for acquiring law enforcement experience are

not as rigid as DOT would have one believe and states that qualifications will be assessed "on a

case-by-case basis."  *Id.*

The record also contains other instances in which "law enforcement" experience receives

a broader interpretation than that which is advocated by DOT.  For example, Privett provided

testimony regarding a particular type of retirement regulation in which "[y]ou don't necessarily

have to be a law enforcement officer to qualify for law enforcement credit."  Pl.'s Ex. 3 at 160

(Privett Dep.).  Similarly, Bob King, Chief, Physical Security, FEMA, stated in an interview

conducted at Privett's request that "FEMA considered Armstrong a qualified law enforcement

office [sic] at the completion of his training [with FEMA]."  Pl.'s Ex. 5 (Interview of Bob King,

dated Dec. 8, 2003).

Armstrong does concede that when employed by the DEA he "worked with 1811's *in*

*support* of law enforcement duties while [he] was with the Technical Operations Group . . . ."

Def.'s Ex. 20 (Questionnaire dated Dec. 5, 2003) (emphasis added).[11]  Assuming arguendo that

this distinction renders Armstrong's service with the DEA ineligible for classification as "law

---

[11] The court notes that, based on the wording of the Questionnaire DOT provided to
Armstrong, it appears that categorizing a job as an "1811" position denotes that the job entails
certain "law enforcement" duties.  However, because DOT has not explained the significance of
1811-categorization, the court declines to make any inference from the absence of 1811-status for
Armstrong's position at the DEA.

enforcement" experience, Armstrong may nevertheless have fulfilled the experience requirement

while employed by FEMA.  Armstrong describes his responsibilities with FEMA as follows:

> Responsible for the development and implementation of all aspects of security for
> Maynard MERS, FEMA Regional office in Boston and FEMA Regional office in
> New York City.  Responsible for the implementation and maintenance of
> physical, personnel and industrial security programs, which consist of performing
> Security Risk Assessments, Comprehensive Vulnerability Assessments of Federal
> Facilities, Executive Protection and Communications Security.  Responsible for
> and conduct investigations involving theft, assault, sabotage and other criminal
> activity. . . .  Serve as the lead Protective Agent for the Director of FEMA and top
> level government officials.

Def.'s Ex. 14 (Armstrong application); *see also* Pl.'s Ex. 4 at 5 (Pl.'s Answer to Interrogs.) ("My

duties during my tenure at FEMA included executive protection, criminal investigations, counter-

terrorism, escort of conveys [sic], special operations, security site surveys, personnel security

. . . .").  In addition, it is uncontroverted that Armstrong was granted Special Deputy status while

at FEMA.  As a Special Deputy, Armstrong had the authority to, *inter alia*, "seek and execute

arrest warrants and search warrants," "make arrests without a warrant," and "carry firearms for

personal protection or the protection of persons covered under the federal assault statutes."

Def.'s Ex. 2 (USMS Policy Directive No. 99-13).[12]  A reasonable jury could conclude that these

type of duties constitute "law enforcement" experience.

---

[12] DOT has advised the court that, during Armstrong's tenure with FEMA, FEMA had a
"Memorandum of Understanding" with USMS that governed how the Special Deputy program
was administered.  DOT suggests that this Memorandum of Understanding affected the
requirements necessary for individuals employed with FEMA to receive Special Deputy status, in
essence making the requirements less rigorous.  DOT does not, however, assert that this
memorandum of understanding in any way abridged the scope of a Special Deputy's authority
once Special Deputy status was granted.

**b.  Circumstances Surrounding Investigation**

In assessing whether Armstrong has successfully created a question of fact regarding whether DOT's proffered reasons for his termination are pretextual, the court also considers the circumstances that led to the investigation of Armstrong's qualifications.

The court notes that there is evidence in the record to support Armstrong's contention that his supervisors, Privett and Prendergast, took umbrage at Armstrong's charges of racial discrimination.  In response to a question about his meeting with Armstrong regarding Armstrong's use of leave and Armstrong's insinuation that discrimination had something to do with the inquiry, Prendergast testified that, "[O]bviously I was very irritated, number one, at the accusation that he was implying.  And number two, at his conduct.  And I strongly urged Mr. Privett to support me in following up with some disciplinary action, because I thought it was warranted."  Def.'s Ex. 7 at 56 (Prendergast Dep.).  Additionally, Armstrong alleges that on October 15, 2004 Privett threatened to sabotage any future job opportunities that might arise if Armstrong continued to press his allegations of discrimination.  Pl.'s Ex. 4 at 3 (Pl.'s Answer to Interrogs.); Pl.'s Ex. 10 at 4 (EEO Counselor's report).  Similarly, Privett discouraged Armstrong from referring to Prendergast as a racist.  Pl.'s Ex. 10 at 5.

The court also notes that the manner in which Privett came to review Armstrong's qualifications could be viewed by reasonable jurors as consistent with a pretextual justification for termination.  Privett testified that he discovered the discrepancies in Armstrong's file during preparation for a mediation session designed to address Armstrong's grievances related to the investigation of his use of leave.  Pl.'s Ex. 3 at 29 (Privett Dep.).  According to Privett, he reviewed Armstrong's resume when he faxed the document to an associate at TSA as part of an

effort to secure alternative employment for Armstrong. *Id.* Armstrong, however, never indicated to anyone that he had a desire to leave DOT. While Armstrong had complained about his treatment at DOT, he never stated that he no longer wished to work with the agency. Viewing the facts in a light most favorable to Armstrong, Privett's unilateral decision to seek a transfer for Armstrong lends credence to Armstrong's assertion that Privett did not wish for Armstrong to remain an employee of DOT.

Because Armstrong has produced sufficient evidence for a reasonable jury to conclude that DOT's "legitimate, nondiscriminatory reason" for his discharge was a mere pretext, DOT's motion for summary judgment must be denied with respect to Armstrong's claims of race discrimination and retaliation.

## III. CONCLUSION

For the aforementioned reasons, it is this 19th day of June, 2006, hereby

**ORDERED** that DOT's "Motion for Summary Judgment," (Dkt. #12) is **DENIED** with respect to plaintiff's race and retaliation claims; and it is further

**ORDERED** that  DOT's "Motion for Summary Judgment," (Dkt. #12) is **GRANTED** with respect to plaintiff's CSRA claim.